*Rodney Johnson vs.*

*Outback Steakhouse of Florida, LLC*

*Rodney Lee Johnson*

*March 27, 2026*



LORI HEAPHY
&ASSOCIATES LLC
CERTIFIED COURT REPORTERS
www.loriheaphy.com    office@loriheaphy.com
337-233-1655

**EXHIBIT**

**1**

**Rodney Lee Johnson - March 27, 2026**

BY MR. HALVERSON:

Q    So we'll go through that.  I'll make a note to myself real quick.  And just to be clear for the record, when you say "Robert," who are you meaning by Robert?

A    Robert, I don't know his last name.  He was an employee that worked there.

Q    Supervisor, coworker?

A    He was a server.

Q    Server.  So I guess that's just how I'm going to identify him.

A    He was a server.

Q    When I circle back with your counsel, I want to note who I need to ask you about.  Okay?

A    Okay.

Q    Okay.  And on that note, when I see -- when I flip through your document production, I see names Brent, Josoline (phonetic)?

A    Joslyn (phonetic).

Q    Thank you.  Joslyn, Jason.

A    Jason is -- he's the proprietor at the one on Jones Creek Road in Baton Rouge.

Q    Okay.  Let's go through one by one.  Who's Brent?

A    Brent is the proprietor.  He's over the one,

**Rodney Lee Johnson - March 27, 2026**

the Outback, off of Acadian.

Q    The one where you worked?

A    Yes, sir.

Q    Do you remember, do you know his last name?

A    Burney (phonetic).

Q    Oh, Brent Burney?

A    Barney, I think it's Barney, yeah.  If you -- I don't --

Q    Joslyn?

A    Joslyn, she's the front of the house manager. Joslyn Savina (phonetic), Savana (phonetic), I can't -- I can't pronounce her last name.  It start with an "S."  She was the front of the house manager.  I can give you -- and Jason, like I say, Jason was the proprietor.  He was over the one in -- in Baton Rouge off of Jones Creek Road.

Q    Did you work at that one?

A    No.  I was trying to get hours.  I was asking, if they were shorthanded, for extra hours.

Q    Do you know his last name?

A    No, I don't know his last name.

Q    Who is Maddy?

A    And Maddy, she was the kitchen manager at -- at the Outback on Acadian.  She wind up getting

**Rodney Lee Johnson - March 27, 2026**

and -- and just comp -- and just comp food off of it and -- and make their money regardless of if they working or not.

Q   Let me ask, is that evidence as I understand your claim here today that we're talking about is that servers would use the comp card --

A   Would use his --

Q   -- to steal money?

A   Yes, would use his card even on his days off. When he was off on Wednesdays, he would -- he would leave his or he would give his card the night before, or whatever it may be, excuse me, to Danielle and Renee so they can use it the next day.  They will also take the Tuck Away cards.  Like, say if you might come in, you have a bad experience, and we will give you a Tuck Away card for Ten Dollars ($10.00), maybe Twenty Dollars ($20.00), for your next visit or whatever.  They would activate the cards, and they would give theirself like a -- they'll activate the card, and then they'll do like Ten Dollars ($10.00), a Ten Dollar ($10.00) tip, using the card, like a Ten Dollar ($10.00) tip, or a Twenty Dollar ($20.00) tip, using -- yeah, using them.

**Rodney Lee Johnson - March 27, 2026**

Q    So I'm trying to understand what's on that phone that is not lost.  Here I think what we're talking about is that theft scheme you're talking in your complaint.  Is any of the things you're talking about that's on the phone -- anything that's on the phone that was lost or destroyed relating to that theft scheme?

A    Just the one with the recording like I say.  And I had with the recording, them, a meeting that they was letting -- letting Renee and -- well, letting them comp food.  They was making sure everybody -- they was pretty much doing it for everybody they said.  But --

Q    Tell me about the recording.  Who are the voices that -- if we had the recording, who would be on it?

A    Oh, Brent Barney and Joslyn.

Q    And what's -- what are they talking about?

A    They talking about that they comp food for everybody.  They make sure everybody eats.  As you can see, they make sure everybody eats.  They do it for everybody.  But he -- they was like people just going to complain just to complain, and he told me, "Don't worry about it.  Again, don't worry about it."

**Rodney Lee Johnson - March 27, 2026**

Q    Don't worry about what?

A    About what the servers were saying about --
about them being more generous towards Renee
and Danielle.  You know, like, they constantly
are using the card, constantly.  And they --
they might get a table.  They might get a
table, say, for instance, with eight people.
And if the tip ain't good, like, if they don't
tip all good, they'll go into the what-you-
call-it, and they will comp Fifteen Dollars
($15.00), Twenty Dollars ($20.00) worth of
stuff off the people ticket, you know, off
the --

Q    So who was doing that?

A    Danielle and Renee.  I don't know -- I don't
know their last name.

Q    Danielle and Renee?

A    Renee, servers.

Q    I'm sorry.  You said Renee?

A    Renee.

Q    Okay.  So, again, I'm sure we'll get back on
this subject.  I'm just trying to make notes.
I'm trying to understand this recording.  The
recording, is it -- are you in the
conversation, too, are you --

**Rodney Lee Johnson - March 27, 2026**

A    Yes.  It's me talking to them telling them about what the servers were saying.  And but they didn't know I was recording anything because I know -- I know that people who've been working in that place for so long, it'll be my word against their word, and they have way more -- what you call that -- they've been there for so long, so it'll pretty much be my word against their word.  So I was -- I was just taking recordings and do -- I was using text messages as proof -- proof for me so I can have backup to -- so if I come and say something, if they say, "Oh, no.  You know, it's not true what he's saying," then I can -- I can pull out, "Well, oh, yeah.  Look, this is what I have right here to back up what I'm telling you."

Q    Okay.  So you didn't alert them that you were recording them?

A    No, I did not alert them.

Q    Do you know whether -- I'm not asking -- you're not a lawyer, so I'm not asking a legal opinion, but I'm asking whether you know if that's permissible in Louisiana to record someone without their knowledge or consent?

**Rodney Lee Johnson - March 27, 2026**

A    No, I didn't know.

Q    Okay.  And let me switch over to Outback's policy.  Do you know whether that's permissible under Outback's policy to record someone without their consent?

A    No, I didn't know that.

Q    Okay.  I'm saying, do you know whether it is? I'm not saying it is or isn't.

A    Oh, no, I don't.  I don't know.

Q    Okay.

A    I never received a handbook anyway like for the rules and stuff like that.

Q    But you didn't inquire whether it was permissible either, did you?

A    No.

Q    Okay.  So then step back then.  It sounds like you're starting off the conversation with Brent and Joslyn about complaints servers are making; is that right?

A    Yes.  It was --

Q    About Danielle and Renee?

A    Yes.

Q    Okay.  So then let's start, what are those complaints that are being made?  Who's making the complaints, and what are the complaints

about Danielle and Renee?

A    It was majority all the servers, like, that what first got my attention about it.  And they were just complaining about, "Oh, it's not fair that they -- they getting Four, Five Hundred Dollars a shift.  And we got to stay here, and we got to bust our, you know, what-you-call-it, just to -- just to get a Hundred Something Dollars."

And I just took it upon myself, I said, "Well, hey," I say, "Brent," and I say, "Joslyn, the servers are complaining about Danielle and Renee comping food all the time."

Q    And so this is on the recording?

A    Yeah, it was on the recording.

Q    Okay.  So, yeah, keep going.

A    And the first person they said was, "It probably was nobody who -- but Rob who told you that."  Because they was asking me who said that.  I say -- I say, "I don't want to say who told me," I said, "But it's a lot of complaints."  And that what made me start looking out, you know, for -- for things.

And when they told me that -- when they told me, "Well, well, we do that for everybody.  We

**Rodney Lee Johnson - March 27, 2026**

make sure everybody eat.  You know, if they get a bad table and nobody done tip, we go in there, and we comp something off and -- and we -- we give it to them in -- in tips.  You know what I'm saying, we knock something off and then, you know, give a little -- a little something."

Q    Who was saying that?

A    Brent.  Brent --

Q    Brent said that they do that?

A    Yeah.  Brent and Joslyn both said that they do.  They said they make sure everybody eats because they know it's hard for servers to make money.

Q    Okay.  I'm glad you clarified.  I'll tell you what I thought you said, what you meant, by everybody eats.  I used to be a server as well for years in college.  We used to get pre-shift meals all the time.  That's what I thought you were talking about.

A    Oh, no.  They -- no.  But that's how -- that's how -- that's how they stated it, they make sure everybody eats, like make sure everybody makes some money on their shifts.

Q    Okay.  So Brent is saying, and Joslyn apparently --

**Rodney Lee Johnson - March 27, 2026**

A    Yeah, yes.

Q    -- are saying they are okay with Danielle and Renee using the comp card to make sure that they get paid on a table or a ticket?

A    Yes.

Q    Okay.

A    That --

Q    So I'm sorry.  I interrupted you.  So you tell me about the conversation.  I'm trying -- since we don't have the recording --

A    Yes.

Q    -- I need to understand what you recall was on the recording.  So, I'm sorry, I interrupted you.  Go ahead.

A    All right.  So, again, basically nobody else have -- have -- like holds the cards, but Renee and -- Renee and Danielle.  Everybody else, if something get comped off, he'll -- they'll come, and they might -- they'll come and comp something off, or they'll give them a Tuck Away card.

Q    Who is the they in this --

A    Joslyn and Brent.

Q    Will do what to who -- for whom?

A    All the -- different servers but mainly it was

**Rodney Lee Johnson - March 27, 2026**

Renee and Danielle.  Like, they'll give -- they might give a server a Ten Dollar ($10.00) Tuck Away card, they might give them a Twenty Dollar ($20.00) Tuck Away card and just say, "Hey, go ahead and use that as your tip."  But Renee and Danielle actually had his manager card.

Before -- before I realized what they was doing with the card, because they used to always tell me, "Hey, Rodney, I need your card. I need your card."  And until Maddy had told me, "Do not give -- give your card to them." And I was like, well, I would say, "Okay.  If you got to comp something off, you do it yourself," you know, so we'll know if it's your -- you know, that it's getting comped the right way, like it's not being comped just so -- so they can pocket money.  And so, like I said, that what it really was, it was them always using his card on -- even when he was there, even when he wasn't there.  They had his card when he wasn't there.

And on April 1st, that's when the incident happened when Renee came ask me for my card, I was working in To-Go.  Renee asked me, say, "Rodney, can I use your card?"  And we was

**Rodney Lee Johnson - March 27, 2026**

already shorthanded, and I told her, I say, "No. You're not using my card. You got Brent card." And I guess she got offended. She got mad. She wind up calling Joslyn. And when I talked to Joslyn, Joslyn say, "What's going on over there?" I say -- I say "nothing."

So they wind up making up a fake Google review about me, and it's all through texts. I'm like -- she said that a customer had a problem with me. But I told her, I say -- I say, "I worked To-Go today. So I don't see how a customer" -- and that's through texts too. I say, "I don't see how a customer had a problem with me in front of the house when I worked To-Go all day."

But then it dawned on me -- then she was like, "Oh, Renee said that you told somebody to write a fake review about her and all kind of stuff." I said "no." And I got all that through texts but anyway so.

Q    Yeah. Let me -- let me redirect us back. So I'm trying to understand what's on that recording. Okay. So, again, just to kind of stay focused on that so when we read --

A    Okay.

**Rodney Lee Johnson - March 27, 2026**

Q  -- this we can have it altogether.  You initiate a conversation with Brent and Joslyn about Renee and Danielle using the comp card?

A  Yes.

Q  And then they say, "We allow that.  We use the -- we allow the comp card to be used to take off some of the ticket so that everybody eats"; is that what you're saying?

A  Yes, pretty -- yes, right.

Q  And that's so everybody can pay their bills --

A  Bills.

Q  -- earn money?

A  Yes.

Q  Okay.  I want to finish this part of the recording.  What else is said in the recording?

A  Pretty much told me -- like I said, pretty much told me I'm worrying about the wrong thing, to worry about Dine Rewards and Google reviews.

Q  Okay.  So what are you raising a worry about?

A  Oh, about me telling them about the servers was complaining about Danielle and Renee making Three, Four, Five Hundred Dollars because they talking about it, they bragging about it, and they got to sit there and bust their, you know --

**Rodney Lee Johnson - March 27, 2026**

Q    Tails, right.

A    -- tails just to get -- just to scrape by with a Hundred Something Dollars while they making Four, Five Hundred Dollars, and they not even working as hard as they are working to try to earn their tips.  So it was a big thing about that.  They was getting into it.  They had --

Q    So you raised that concern -- in this audio you're raising that concern to Brent and Joslyn?

A    Yes.  And --

Q    And they said, "We do -- we allow that so that everybody can eat"?

A    Yeah.  They -- well, they told me that -- they told me that they just don't do it for Renee and Danielle.  That they do it for pretty much everybody, like all the servers, to make sure that they all eat, that, you know, saying because they know it's hard to make money as a server.

Q    Okay.  And so tell me more -- is there anything more on the audio?  You said --

A    No.  It was -- it was basically that right there.  And they telling me, when I first brought it to their attention, when I was

**Rodney Lee Johnson - March 27, 2026**

-- first word out their mouth, when I told them that, first word out their mouth was, "Nobody probably done told you that but Robert."  And then I told them "no."  I said -- I said, "It's a couple people that's talking about it and complaining about it."  And that's when he said, well, both of them said, that they make sure everybody eats.

Q    Okay.  So your understanding of that statement was that they do -- they use that comp --

A    They comp, yeah.  They comp stuff off for everybody.  Like, if somebody get a bad table, that what he said -- they said -- they say -- they say, if somebody get a bad table, somebody don't tip good, they'll go in and they'll comp something, their exact words.  They'll -- they'll give them a Tuck Away card for Ten Dollars ($10.00).

Q    A Tuck Away is like a coupon?

A    Yeah.  It's like -- it's like -- like I say, if you come in, you might have a bad experience.  You might -- you'll probably wait like thirty (30) minutes, forty (40) minutes for your food.  Your food get to the table.  It's cold.  Or you got a -- or you say, "No.  I'm not waiting no

**Rodney Lee Johnson - March 27, 2026**

more."  You just walk out and leave, they'll say, "Hold on.  Let me give you a Tuck Away card, so when you come in again, you know, what I'm saying, you can have Ten Dollars ($10.00) off or Twenty Dollars ($20.00) off on" --

Q    Like a cou- -- like a gift card?

A    Yeah, like a gift card pretty much.

Q    Okay.  So they --

A    They will activate the gift cards, a Ten Dollar ($10.00) gift card, activate a Twenty Dollar ($20.00) gift card, and they'll use it as a tip.

Q    So Brent and Joslyn said they'll do that, they permit that as well?

A    Oh, yes, yes.

Q    Not just for Danielle and Renee but all the servers?

A    Pretty much all the servers.

Q    Okay.

A    But Danielle and Renee was the one who actually had his personal card.

Q    Oh, yeah, yeah.  One quick thing, did y'all discuss that on -- as well on the audio?

A    Yeah, that was on the audio.

Q    That they had -- that Renee and Danielle had

**Rodney Lee Johnson - March 27, 2026**

Brent's comp card even when Brent was not there?

A     Yes.

Q     Do you know how Danielle and Rene got possession of Brent's comp card?

A     He gave it to them.  There was -- there was days where, when I opened up in the morning, I would have -- I have to use my card to open the drawer for the bar.  So what I would do, just to see if they had the card or not, I wouldn't even -- I wasn't -- I wouldn't even unlock the drawer.  So if they came in and they unlocked that drawer, I knew that they had his card.  Because if I'm the only one -- if I'm the only one with the manager card to open up the -- the drawer, how can you open it if you don't have a manager card?

Q     So is that discussion also on that audio?

A     No, it's not in the audio.

Q     Okay.

A     But that -- that was how I knew the days when they did have it.

Q     Okay.  So let me kind of close the loop on this, this phone, as well.  So the only thing that was on your old phone, your prior phone,

**Rodney Lee Johnson - March 27, 2026**

into it with everybody, trying to fight everybody, for no reason.

And I told him I had wanted it -- I wanted it be put on paper, also, for Brad put on paper, and he just told me "no." He going -- he runs the restaurant the way he want to, his name is on the door, I'm trying to run his restaurant. So and that was the second one. That was the only two that I had on my phone with -- with -- with like actual audio.

Q    Related to the -- that would be related to this lawsuit --

A    Yeah, yes.

Q    -- using the comp card and --

A    Uh-huh.

Q    -- whatnot?

A    Yes.

Q    Okay. And just to clarify and for the court reporter's attention, when you say Brent, his last name is Barney?

A    Yeah, Brent Barney.

Q    Yeah. B-a-r-n-e-y?

A    Yeah. That's how.

Q    Okay. Because I was saying it wrong, too, that's why I wanted to make sure --

**Rodney Lee Johnson - March 27, 2026**

A    Yeah, apprenticeship, yeah.  I had got offered to go to -- I had got offered to go to Golden Palace or -- it's somewhere in New Orleans.  It's where all the chefs go to, like -- like Emeril Lagasse went to.

Q    Okay.  We've been going for a while now.  I think Dottie would like to stretch her legs.  So let's take a --

MR. KATAEV:

You read my mind.

MR. HALVERSON:

Yeah.  I didn't realize how long we had been going.  I apologize.

(BREAK 11:55 A.M. - 12:09 P.M.)

BY MR. HALVERSON:

Q    So we'll go back on the record.  So let's talk about your employment with Outback.  What was the position you started in and were there any different positions you held throughout your employment?  Just tell me the positions, then we'll go through them.

A    The position, I was front of the house key.  You want the job titles that went along with it?

Q    I'll list them.  So front of the house key, was

**Rodney Lee Johnson - March 27, 2026**

that what you started as?

A    Yes.

Q    Okay.  Did you hold any other positions?

A    That was it.

Q    So as the front of the house key what was your job duties?

A    From my understanding, when they hired me, they told me that I would open up in the morning, so I would like count the drawers, open up the restaurant, that I may have to -- that I will have to work expo at times.  I was to talk to the customers about Dine Rewards and Google reviews.  I would have to, you know, like, bring drinks to the table or help the server out, when they needed help, if they was too busy.  Or if the line was getting behind, I would have to hop on the line and help out -- and help the line out.

And when I started working, then they told me, oh, I've got to do line checks.  I was supposed to do line checks, like, temp everything out, make sure everything is temp. But that wasn't told to me in the beginning. That was way after, down the line, that when that became known to me.  And working To-Go.

**Rodney Lee Johnson - March 27, 2026**

Q    Anything else?

A    No.  That was -- that's it.

Q    Okay.  During the -- well, who did you interview with?

A    I interviewed with Brent Barney, Brent Barney and Maddy, the kitchen manager.

Q    Oh, Brent -- you say Burney, but it sounds like it's --

A    Barney.

Q    Barney.

A    Barney.

Q    I think it's just the way we're saying it --

A    Yeah.

Q    -- or the way I'm hearing it at least.  Okay. So you have an interview with Brett, Brent, I'm sorry, Barney, and you said Maddy?

A    Maddy.

Q    Maddy?

A    She was the kitchen manager.

Q    Do you remember her last name?  I think I asked you that before.

A    No, I don't.

Q    Okay.  That's fine.  And who hired you?

A    Brent.

Q    How did you come to Outback to begin with?

**Rodney Lee Johnson - March 27, 2026**

Q     Okay.  So then I know that you talked about this in your -- oh, well, hold on.  Let me step back.  Did you receive any bonuses, commissions --

A     No.

Q     -- as part of your work with Outback?

A     No.

Q     Your immediate supervisor was Brent Barney?

A     Yes.

Q     Okay.  So it's mentioned in your lawsuit and this is a good time to maybe talk about it.  Did Brent ever criticize your work?

A     No.  The only thing he ever told me was Dine Rewards and Google reviews was down.

Q     You talked about that.  Tell me about that.

A     In the beginning, like, well, really pretty much towards the end -- well, when he hired me, he told me that I had to get like -- to get Dine Rewards and Google reviews.  I was never properly told that when customers come in that -- that they can be old -- like, if they already have Dine Rewards, that all I do is put their phone number in, you know, so it can stay going.  I was told that.  I was told they're trying to get new -- get new Dine Reward

**Rodney Lee Johnson - March 27, 2026**

members.

Q    Okay.  Let me pause there.  You've said that phrase Diamond Rewards a few times.

A    Dine, Dine Rewards.

Q    Dine Rewards.

A    It's Dine, D-i-n-e.  I'm sorry.

Q    Not Diamond, Dine?

A    No, Dine Rewards.

Q    Dine Rewards.  Okay.  Can you, for the record, tell us what Dine Rewards is?

A    All right.  So Dine Rewards is, if you new to Outback, just in general you put your phone number in, and the way you log -- you sign up for Dine Rewards.  Dine Rewards, if you come in so many times, you can get like a free appetizer, you know, you can get like a free bloom -- a blooming onion.  But you come in so many times you might get ten percent (10%) or something like that off your meal.  That's what I was told.

Q    Okay.

A    And I was told that they was pretty much last in the region or something with Dine Rewards.

Q    So one of your job duties as the front of the house key was to increase those numbers --

**Rodney Lee Johnson - March 27, 2026**

A    Yes.

Q    -- among the Outback, the clientele's base --

A    Yeah.

Q    -- to boost their numbers --

A    And it wasn't --

Q    -- on the Dine Rewards part?

A    Yes.  And it wasn't only on me.  It was also on the servers as -- the servers as well to -- to offer the Dine Rewards and Google reviews.

Q    Sure, sure.  Okay.  So was there a metric or some measure that you had to hit in terms of Dine Rewards, like, "We want this number of sign-ups, or we want" -- I don't know, I'm just spitballing here.  Was there any --

A    Well, I was just told, when they hired me, that they was pretty much almost last in the region and they just -- they wanted to boost their -- boost it up, like, get better Dine -- better Google reviews and get more Dine -- Dine Reward members.

Q    And they didn't tell you about how much?

A    No.

Q    Your understanding was you were unaware --

A    Of, yeah.  I was unaware.  They never told me a certain percentage or how much they needed to

**Rodney Lee Johnson - March 27, 2026**

Please follow up in writing.

MR. HALVERSON:

Yeah.

COURT REPORTER:

I'm sorry.  What did you say, Mr. Kataev?

MR. KATAEV:

Please follow up in writing.

COURT REPORTER:

Thank you.

BY MR. HALVERSON:

Q     Now, those text messages in GroupMe that we're talking about, that's both -- you're doing a good job, keep it up, that's both with respect to Dine Rewards and Google reviews or just one or the other?

A     Both.

Q     Both.

A     And also, me helping out.  I got like -- just all around in the kitchen, working in the kitchen and --

Q     Okay.

A     -- but mainly for that.

Q     Okay.  So this part of the conversation started off with the question, Did Brent Barney ever

**Rodney Lee Johnson - March 27, 2026**

criticize your work?  And you mentioned that Brent said that Dine Rewards and Google reviews were down.  Do you remember that?

A    Yes.

Q    Okay.  So talk to me about that then.

A    Okay.

Q    When did Brent make that comment to you?

A    I'm going to say probably February, probably.

Q    Of 2025?

A    Yeah, probably in February.

Q    How did that come about?  Tell me the circumstance how this conversation came about.

A    Oh, the conversation came about, oh, I can -- when we sat down, when I told you I had sat down, had the conversation with him about all the stuff that was going on.  He got mad and told me that I'm worrying about the wrong things, that my job is Dine Rewards and Google reviews, and they are down, talking about -- he told me -- he told me -- he told me don't worry about nothing else but that.  Don't worry about how, you know, he's running his kitchen and what he's doing.

You know, and he got -- I guess he got aggravated because I was always coming telling

**Rodney Lee Johnson - March 27, 2026**

felt you were a part of management?

A    Because they told me.  They said -- they told me in their own words, exact words, was, "Rodney, you're not a manager, but you are a manager.  You know, you're under us."  And I was told -- I was told that when they are not there and open up, that I am -- I am the manager.  Because, when they not there, like, if I open in the morning, I'm the only one there.  So they told me -- they told me I am over the kitchen so --

Q    Okay.  But in terms of --

A    -- front of the house I mean.

Q    -- when you're not there, you still didn't have any greater powers in terms of hiring/firing employees?

A    No.  I just did -- I just did interviews.

Q    But in terms of when they're not there, you just --

A    No.

Q    -- ran the restaurant?

A    Yeah, I ran the restaurant.

Q    Okay.  So this comment -- so what we're talking about is Brent criticizing your Dine Rewards and Google reviews, those being down?

**Rodney Lee Johnson - March 27, 2026**

A       Yeah.  But it was only down -- I have through text messages, too, when he was telling me about it.  I say "well" -- I say, I was like -- I told Joslyn.  She said, "Well, Rodney, Dine Rewards are down, and Google reviews down."  I say, "Yeah.  I understand that."  I say, "But by us being always shorthanded now, you know, I have to work" -- and I got it through texts.  I have to work -- I have to open up.  I got to -- I got to work To-Go.  I got to work To-Go.  I got to work expo.  I have to work the line plus try to talk to the customers and run food and bring drinks.  I said -- I said, "I can't -- I can't sit there and focus on Dine Rewards and Google reviews."  I said, "Because we are shorthanded."  I got that through the text.

        And I was told -- and I was told don't worry about -- I was told don't worry about they waiting forty (40) minutes or fifty (50) minutes on their food, to try to focus on Dine Rewards and Google reviews.  I say "hey" -- I say, "Hey, ain't nobody going to want to sign up for no -- for no Dine Rewards or give -- or give a good review if they been here for forty (40) minutes or an hour waiting on their food,

**Rodney Lee Johnson - March 27, 2026**

and they have an hour lunch break." You know, and -- and I got to bring food, I got to make drinks, I got to work expo, I got to hop on the line because we shorthanded. You know, it's impossible.

Q  Okay. So this started with a question about your criticizing -- Brent criticizing your work, Brent mentioned Dine Rewards, Google reviews are down. You said this occurred in February 2025 at about the same time as those conversations we talked about earlier, and that's what I wanted to clarify. Was this conversation with Brent and your performance at the beginning of February in that first conversation that you recorded, or is it the second recording at the end of February?

A  It was the second one.

Q  Okay.

A  Because I actually caught him sitting down and went talk to him.

Q  Okay. And that second conversation was more of a broad conversation where you're bringing up a whole host of issues?

A  Yes.

Q  Okay. We'll talk about that in a second too.

**Rodney Lee Johnson - March 27, 2026**

A      Okay.  But previous before then I was bringing up a lot of -- a lot of problems that was going on in the restaurant before I sat down and talked to him.  Like I say, it wasn't just in February.  It was way -- it was way before then like of me telling him a lot of things that was -- that, you know, what was going on about the cross-contamination and the people drinking and smoking and getting drunk on the line, about the fight, all kind of stuff.  It was --

Q      Okay.  So just to kind of be clear on this part of the conversation, Brent is saying -- telling you Dine Rewards are down.  So they had -- was it the understanding or your understanding that the understanding between y'all that Dine Rewards had increased or Google reviews had increased, but at that point in February 2025, where y'all were having this conversation again, they had fallen?

A      They had fallen because we were shorthanded of workers.  I would come in, I would come in the morning, open up.  I would be like, "hey," I would call Joslyn or I would call Brent.  I'll say, "Hey, Brent, such and such isn't here." They were like, "Oh, yeah.  I forgot to tell

**Rodney Lee Johnson - March 27, 2026**

you they're not coming into work today."  It's -- it's 10:30, we open at 11:00, and I got -- and I'm calling y'all and asking y'all, "Well, such and such isn't here," or I call the person to see where they at, they don't answer, then they're like, "Oh, yeah.  I forgot to tell you they not coming in this morning."

Like, that's something right there that you shouldn't, you know, forget to tell somebody -- somebody who's opening up your building.  If you know they wasn't coming, that should have been told to me, you know.  But it wasn't no communication.  There was times where they were supposed to be there in the morning or at a certain time.  They not there.  I'm like, "Where y'all at?"  "Oh, I forgot.  Oh, my bad. I had something to do today, or I had to take off."  I'm like, "Well, okay.  Nobody didn't tell me."

Or they would have Joslyn scheduled for 12 o'clock to come in, and she don't get there till 2 o'clock, 3 o'clock, sometimes 4 o'clock. But I'm stuck there until she get there, you know.  In the beginning when -- like I say, in the beginning where everything was all good, I

**Rodney Lee Johnson - March 27, 2026**

wasn't saying anything about the stuff that was going on, they didn't have no problem with me. But, like I say, soon as nobody was coming to work, the people who was working the line was getting into with the dude Stephan, and they just quit or they walked off, and I had to stop doing what I'm doing as -- you know, as the front of the house key to go work the line.

Q    So any other moments where Brent Barney is criticizing your work --

A    No.

Q    -- besides this conversation of --

A    No.

Q    -- Dine Rewards are down?

A    Just never criticized my work.  That was it, just about the Dine Rewards and Google reviews, until I started -- he said I was complaining and worrying about the wrong things.

Q    Okay.

        MR. KATAEV:

            Mr. Johnson, please just wait for Mr. Halverson to finish his question before you speak.

A    Okay.

        MR. HALVERSON:

**Rodney Lee Johnson - March 27, 2026**

Thank you.

MR. KATAEV:

Slow down.

BY MR. HALVERSON:

Q    Was there ever a conversation or notice, otherwise, provided to you that you were not satisfying or fulfilling your job duty of actively promoting the Dine Rewards program?

A    No.  The only other time was probably in March when -- it was probably in March when Joslyn had told me about Dine Rewards was -- were still down, and that's when I texted and told her, I say, "I understand Dine Rewards is down," I say, "but, you know, we've been shorthanded.  I have to" -- I say -- I say, "I've been having to work the line.  I have to work To-Go.  I have to work expo.  I have to run food.  I have to -- I have to bring drinks to the table."  I say, "We shorthanded. You know" -- and I just say, "You know, we've been shorthanded, so I can't focus on that.  I've got to -- I've got to stay here and push this food out and get -- and get these people in and out."

Q    Okay.  Joslyn, last name, is her last name

**Rodney Lee Johnson - March 27, 2026**

Silva?

A    Silva, yes.

Q    Yeah.  Okay.  So that's -- you were trying to remember her last name earlier.  I think, just for the record, I think that's the name you were talking about earlier?

A    Yes, yes.

Q    Okay.  And Joslyn Silva, she was a manager?

A    She was the front of the house manager.

Q    Was that a supervisor of yours?

A    Yeah.  She was -- yeah.  She was over the -- over the front -- the front of the restaurant, like, servers and bartenders she was over.

Q    Everybody?

A    Everybody in the front of the house.

Q    Okay.  Including you?

A    Yes.

Q    Brent Barney, you called him I think the proprietor?

A    Yeah.  He was the proprietor.  He was over everybody.

Q    Okay.  So would you know him to have the position of managing partner or general manager?

A    General manager.

**Rodney Lee Johnson - March 27, 2026**

A        Yes.  Yes, Boost Mobile.

Q        Would you have your phone records as well?

A        No.  I don't have my phone records.

Q        Okay.  So I'll be candid with you.  I want to confirm your contention that you called corporate on April 1, 2024 or around there --

A        It was -- it was April 21 -- it was April 1st.

Q        2024?

A        Yeah, yes.

Q        And so my question to you is:  Do you have any records that will support your contention that you called corporate, Outback's corporate, office on or around April 1, 2024?

A        I would have to see about going about getting them on that.

        COURT REPORTER:

                I'm sorry.  Can you move your hand?

A        I would have to see about going -- going getting them.  I'll see how I can do it.  But, yes, my phone records will show.  I actually called corporate first, HR, to get the number to call them to make the complaint.

BY MR. HALVERSON:

Q        Okay.  So I'll reach out to your counsel about a supplementation in that regard, too, but I

**Rodney Lee Johnson - March 27, 2026**

He didn't say nothing.

Q   Okay.  But in terms of whether you made the -- in terms of whether Brent or Joslyn knew in advance or prior to your termination -- let me step back.  Had you before alerted Brent or Joslyn that you had called corporate?

A   No, I didn't.

Q   Okay.  You were making the clarification as to whether Brent was aware of the recordings, my question on that, right?

A   Yes, through that text right here (indicating).

Q   Okay.  So let's talk -- in terms of discipline we talked about one item of potentially discipline, and I'll call it discipline -- you don't have to agree with me -- but where Brent counseled you that the Dine Rewards were down or the Google reviews were looking bad, that's one thing we talked about earlier.  Do you remember that?

A   Yes.

Q   Okay.  And you talked about that, that was in response to you making also a complaint, and he's saying, "Well, you need to focus on your job," right?

A   No.  Yeah.  He told me that I need to focus on

**Rodney Lee Johnson - March 27, 2026**

of my items, personal items, just to move.

I wasn't -- like I say, I got sick. I started being in and out the hospital. I wind up losing my relationship, also, over this because of financial burdens.

Q    Let me -- before we get there and I do -- I am curious about that. That is -- I have some questions on that too. Let's talk about what you believe Outback did wrong. Why was your termination wrong in your belief?

A    In my belief my termination was wrong because I asked to speak to the district manager, the regional manager, and to inform him about everything that was going on in the restaurant. And prior to that, like I say, I wind up calling -- I wind up, you know, calling HR and everything to report it. And by me telling him directly out of my mouth I want to -- I want to speak to Dale, and they'll know everything that's going on with theft and everything, that's how I feel I was terminated.

Q    Okay. So I'm going to hand you a copy of what's called your complaint, the thing that -- we call it the lawsuit, but it's the thing that starts the lawsuit. We call it the complaint.

**Rodney Lee Johnson - March 27, 2026**

activate and use as -- as tips.  It's theft.
And having their family members come in and eat
for free, that's theft.  That's where food
costs come at.  That's where -- that's where we
losing in food costs.  You talking about food
costs aside, but if you comping meals and
letting people come and eating for free, that's
where your money is going.

Q    Okay.  So the theft here is using the comp card
and the what cards?

A    The Dine, not Dine Rewards, it's the Tuck Away
cards.

Q    Tuck Away.

A    They call them -- they call them Tuck Away
cards.

Q    Thank you.  So I'm making notes, by using the
comp card and Tuck Away cards.  Tuck?

A    Tuck -- I think it's called Tuck Away.  They
called Tuck Away.  And those are just like --
like you say, kind of like gift cards, or when
people have a bad experience, they come back
and use the cards.

Q    Okay.  So was it -- and I heard your -- in our
conversation today, the way I understand it
went down was that Brent would allow Danielle

**Rodney Lee Johnson - March 27, 2026**

and Renee to use the comp card?

A    His card, yes.

Q    Okay.  And that Brent would, also, and Joslyn would use the comp card for other servers as well?

A    But, yeah.  They would give them Tuck Away cards.  They would mostly give them like Tuck Away cards to use.  They took stuff off for them, but it wasn't like how they was doing it for Renee and Danielle.

     And if I can say something with that part right there, now, they talk about -- they say they had to make cuts and about my work experience.  One of the people, when I was telling you earlier about -- I'm not off-track. I'm just making a point to you.  When I was telling you how the servers was complaining about it, Robert, the same one who was texting me, he got caught doing it.  And well, from what I was told from Brent, they had to fire him because it came from corporate, right.  A week, week and a half later after he had -- after he fired him they said -- they said -- they said that they had to fire him.  A week and a half later he hired him right back and

**Rodney Lee Johnson - March 27, 2026**

Q    Let's focus on Louisiana law.  So under
Louisiana law I will represent to you -- again,
I'm not giving you legal advice.  I'm not your
attorney.  This is my understanding.  Theft
under Louisiana law requires a showing that
someone took property belonging to another
person without that person's consent.  Okay.
That's the definition I'm working off.

I see the issue here is one of how are you
going to show that there was no consent for
using the comp card?

MR. KATAEV:

Objection.

A    I don't know.

BY MR. HALVERSON:

Q    What evidence do you have to support your
contention, if you have the contention, that
there was no consent to use the comp card?

A    I can't prove it, but, like I say, it wasn't
like it was no consent.  It was consent because
he gave it to them.  He gave -- it was given to
them by him to use for those purposes so they
can make tips and have -- and come out and
leave with nice -- with a nice bit of tips.

Q    So do you believe that -- when you say he gave

**Rodney Lee Johnson - March 27, 2026**

him -- them the comp card?

A    Brent gave them the comp card so they can leave with good tips at the end of the day.

Q    Brent gave Danielle and --

A    And Rened his comp card so they can leave at the end of the day with good tips.

Q    And they would apply the same -- and Joslyn and Brent would do the same thing for other servers, just not to the same degree or amount, right?

A    Yes.

Q    Okay.  It seems what your whole idea is boiling down to is that you believe that Brent did not have that authority to do that; is that your belief or no?

     MR. KATAEV:

          Objection.  Argument.

A    No, that's not my belief.  My belief is it was wrong.  It's not part of your -- of his -- of his -- of his title to say, well, if you have a bad day -- a bad day of tips, I'm going to make it right for you and let -- and give you money that -- money that you didn't even really work for.  It was given to you.  If -- I just feel like -- like I told him, if they was to put in

**Rodney Lee Johnson - March 27, 2026**

the effort and work for their tips, they can make tips.

BY MR. HALVERSON:

Q    I think we are saying the same thing.  I'm using a legal phrase.

A    Yeah.

Q    But I'll accept your answer.  I understand what you're saying is what I'm saying.  Okay.

MR. KATAEV:

Objection to form.

MR. HALVERSON:

No.  There was no question.

BY MR. HALVERSON:

Q    I was just letting you know I understand what you're saying.  The next thing, how were you -- well, let me get your belief.  Is it your belief that the specific item -- well, let me step back.  How much -- let me try this. Strike that.  Can you point to a specific sale or ticket where there was a comp card that was used without proper approval or authority?

A    I couldn't tell you the -- I could not tell you the ticket number or nothing like that.

Q    You don't have any tickets or evidence of a comp card being used at all, do you?

**Rodney Lee Johnson - March 27, 2026**

A    Well, I can't tell you the tickets, and you know, I can't tell you that.

Q    So that's my question.  You don't have any evidence of any tickets where the comp card was used at all, do you?

A    No.  Not with tickets, no.

Q    Is that a yes or a no, you don't have any?

A    No.  I just say -- I say no.

Q    Okay.  So then what evidence do you have that the comp card was used without consent or without proper authority at all?

A    Because I saw them using the card.  Like I say, I can't tell you what ticket it was, but I saw them comp stuff off numerous times and put -- and pocket the money.

Q    But then that's actually the point is is you're watching -- you're saying them.  You're saying you watched Danielle and Renee --

A    Renee.

Q    -- use the comp card?

A    Yeah.

Q    How do you know that they didn't have -- it was for -- it wasn't for a legitimate reason?

A    It wasn't because they also talked about how they had -- they also talked about how they had

**Rodney Lee Johnson - March 27, 2026**

Q    Let's keep with the theft thing at the moment.
What evidence do you have to support your
contention that Outback committed theft?

MR. KATAEV:

Objection.  Calls for a legal
conclusion.

A    Just me telling him that I had the recordings
-- the recording of him and Joslyn and me were
saying how they was doing comps for -- for
everybody to make sure that they made money and
they eating so.

BY MR. HALVERSON:

Q    But we don't have those recordings, do we?

A    Not anymore.

Q    Okay.  So you've produced documents 1 through
twenty-something, 26.  Do any of those
documents support your belief or what do you
think would show that Outback committed theft?

A    No.  And again, like I said, if they record --
well, it doesn't matter now I guess.  But I
told them multiple times at the time when I did
have the recordings.  When I called and made --
I made it known that I did have it, the
recordings so.

Q    Did you ever disclose to anyone outside of

**Rodney Lee Johnson - March 27, 2026**

Outback that you believed that the company was engaged in theft?

MR. KATAEV:

Objection.  Foundation.

BY MR. HALVERSON:

Q    Or that anybody with the company was engaged in theft?

A    What you mean, like, anybody else that worked there?

Q    No.  Anybody outside of who worked there?

A    No.

Q    Did you ever threaten Outback that you would disclose that the company or its employees were engaged in theft?

A    No.

Q    Did you ever participate in a public body -- I'm sorry.  Did you ever testify before a public body conducting an investigation, hearing, or inquiry into theft by Outback before your termination?

A    No.

Q    Did you ever provide information to any public body who was conducting an investigation, hearing, or inquiry into theft by Outback before your termination?

**Rodney Lee Johnson - March 27, 2026**

A    No.  Just the -- like I say, when I reported it.

Q    Internally to corporate office?

A    Yeah, yeah.  But not outside, no, sir.

Q    Okay.  So then the subpart (3), and that one reads, Objects to or refuses to participate in an employment act or practice that is in violation of law.

Did you ever object to an employment act or practice that is in violation of law?  And I think what you're saying the violation is theft, so I'll rephrase.  Did you ever object to the use of the comp card by Brent and other employees?  I'll stop there.

A    Did I object to it?

Q    Did you object to it?

A    Yes.

Q    Okay.  Did you refuse to participate in it?

A    Yes.

Q    Okay.  So let's focus on that.  And as I understand your testimony, your objection was when you made the report to corporate in April of 2024, right, as well as --

A    Yes.

Q    -- maybe other recordings you made in February,

**Rodney Lee Johnson - March 27, 2026**

you're objecting to Brent as well, right?

A    Yes.

Q    Okay.  So I want to hone in on the phrase, the phrase reads, Objects to or refuses to participate in an employment act or practice that is in violation of law.  I want to focus on the phrase employment act or practice.

In your belief is an employee stealing from the company within the scope of their employment?

MR. KATAEV:

Objection.  Argumentative.

BY MR. HALVERSON:

Q    Is it part of their job duties?

A    You're saying it's a part of their job to steal?

Q    Yes.

A    It's not a part of their job to steal, no.

Q    Okay.  You don't believe you could steal from a company as part of your job, right?

A    No.  I take pride in my work.

Q    Okay.

A    That's why I evolve in pay raises and stuff like that.  I go above and beyond.  Even Fleming's, even Bonefish, they can tell you my

work was exceptional.  They didn't have no problems out of me so.

Q    The employment act or practice you're focusing on here is Brent's use or permission to use his comp card to give money to Danielle, Renee, and other servers; is that right?

A    Yes, but mainly Danielle and Renee.

Q    And if you say he doesn't -- your contention is that he's not allowed to do that, right, to use the comp card for that purpose?

A    Yeah, not for that purpose right there.

Q    So if it's not -- if he's not allowed to do that, would you say that if it is an employment act or practice, it's within the scope of his employment?

        MR. KATAEV:

            Objection.  Calls for a legal conclusion.

BY MR. HALVERSON:

Q    Subject to that objection.

A    I mean, no.  If I'm responsible for a business, and my business is to make them money, I can't see myself letting them lose money by just giving it away for free and people not earning it, earning their pay or working for their pay.

**Rodney Lee Johnson - March 27, 2026**

Q    So I want you to hold that for just a moment. Okay. Now, let's consider something else. Suppose Brent had that authority to use the comp card as you described. This is suppose, and I know you don't -- I see the disbelief on your face. You don't believe it, right?

A    No.

Q    Okay. But suppose he does have that authority to use the comp card, as you described, to benefit the servers with money. Okay. It's a big suppose. I got you. You don't believe it, but suppose it. Would that be theft then if that was within the scope of his employment? In your opinion would that be theft?

         MR. KATAEV:

              Objection. Hypothetical, speculation, opinion testimony. You may answer.

BY MR. HALVERSON:

Q    Subject to those objections.

A    I'm just -- I'm going to say if they say, "Well, yeah, you can comp stuff, you can comp food off, so your server can pocket the money, so they can have good tips to go home with," if they say it, then yes, it's -- it's all right.

Q    Not theft?

**Rodney Lee Johnson - March 27, 2026**

A    It's not -- yeah.  If they say that he can do it, they can comp Four Hundred Dollars ($400.00) worth of food off, Five Hundred Dollars ($500.00) worth of food off, in one sitting, and yeah, you know, if they say, yeah, all right.  But they losing money.

Q    Bad business, may be, but not theft, right?

A    It's not.

MR. KATAEV:

Objection.  Argumentative.

COURT REPORTER:

I'm sorry.  What was your answer?

A    No, it's not theft if they allow it.

BY MR. HALVERSON:

Q    In that situation and if they allow it.  Thank you.

A    And can I say this?

Q    Yes.

A    We wind up -- I wind up going to a meeting for front of the house keys and managers in New Orleans prior to that.  And the big meeting was about comps was being high at the restaurants, not -- and not to really -- not to really use the Tuck Away cards.  Tuck Away cards was only -- only meant to be used only for like real