**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA**

RODNEY JOHNSON,

                Plaintiff,

    vs.

OUTBACK STEAKHOUSE OF FLORIDA,
LLC,

                Defendant.

Case No.: 3:25-cv-376 (BAJ) (RLB)

**PLAINTIFF'S OPPOSING
STATEMENT OF
<u>MATERIAL FACTS</u>**

Plaintiff Rodney Johnson ("Plaintiff"), by his attorneys, Sage Legal LLC, hereby respectfully submits this response in opposition to the Defendant's Statement of Uncontested Material Facts Pursuant to Local Rule 56(c). Following his response to Defendant's Statement, Plaintiff also sets forth those additional facts as to which it contends there are genuine issues to be tried consistent with the requirements of Local Rule 56.

<u>**PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT**</u>

1.     On July 31, 2023, Brent Barney ("Barney"), the proprietor of an Outback restaurant located on Acadian Thruway, hired Johnson to be the Front of the House Key ("Key") for the restaurant. (Exhibit 1, Johnson Deposition 24:23-25:8, 122:16-124:24, 159:18-20; Exhibit 2, Barney Declaration.).

**Response: Qualified that, according to the Defendant's own statements, Barney is a co-owner of the Defendant and is therefore not *the* "proprietor;" admitted as to the remaining statements of fact. <u>See</u> ECF Docket Entry 25-3 ¶ 2 (referring to himself as "part owner").**

2.     As a proprietor, Barney co-owns the Acadian location with Outback and serves as the restaurant's Managing Partner, akin to a General Manager. (Exhibit 1, Johnson Deposition 159:18- 25; Exhibit 2, Barney Declaration.)

**Response: Admitted.**

3. As a Key, Charging Party was responsible for overall restaurant management which included completing server table assignments, greeting and ensuring guest satisfaction, promoting enrollment in Dine Rewards (customer loyalty program), and assisting employees where needed, such as bringing food items to tables or assisting with host duties by seating guests during busy periods. (Exhibit 1, Johnson Deposition 123:5-25; Exhibit 2, Barney Declaration.)

**Response: Admitted.**

4. Throughout Johnson's employment, Barney and other managers routinely observed Johnson failing to meet performance expectations. (Exhibit 2, Barney Declaration.)

**Response: Denied. Any alleged performance issues by Plaintiff at Outback were not documented, even despite Plaintiff requesting that any issues be documented in writing. Johnson Dep. 33:1-7; 250:20-251:5 (Johnson was never disciplined prior to his termination). Any alleged performance issues were pretextual following Plaintiff's protected activity under the Louisianna Whistleblower Protection Act, La. Rev. Stat. Ann. § 23:967 ("LWPA"); this is exemplified by the fact that Johnson has not been subject to any discipline, write-ups, suspensions, or verbal counselings while at his later job at Chili's. Johnson Dep. 99:8-12. Similarly, Johnson did not quit his job at Harvest Manor via no-call, no-show. Johnson Dep. 111:13-115:6. Johnson was never terminated from any job other than Outback. Johnson Dep. 115:1-6; 115:14-16; 115:17-116:5; 116:6-25; 117:1-3; 118:16-23; 125:23-127:25. Notably, Johnson worked at other Outback locations without facing any disciplinary action or termination. Johnson Dep. 124:25-125:22; 298:3-7 (between the time of Johnson's report to corporate on April 1st to the time of termination on May 1, 2024, Brent did not advise Johnson of any fault in his work performance); Johnson Decl. ¶¶ 10-17 ("During my**

employment at Outback, I was never issued a written warning, write-up, suspension, performance-improvement plan, or other written discipline;" "I asked that any claimed performance problem be documented in writing, but Outback did not provide me with any such documentation;" Barney did not counsel me for allegedly lacking productivity or teamwork;" "I regularly assisted wherever help was needed, including on the food line, in the To-Go area, at the expo station, and in other areas of the restaurant;" "I also came to work on scheduled days off and weekends when the restaurant was short-staffed;" "Further, I worked at Outback locations other than the South Acadian Thruway location without being disciplined or terminated at those locations;" "Between my April 1, 2024 report to Outback's corporate reporting line and my May 1, 2024 termination, Barney did not tell me that there was any fault with my work performance;" "No one advised me during that period that my employment was in jeopardy or that I might be terminated for a performance-related reason").

5.      Specifically, Johnson failed to actively promote Outback's Dine Rewards and did not demonstrate that he was a team player willing to assist employees during peak times.( Exhibit 2, Barney Declaration.)

Response: Denied. Johnson actively promoted Outback's Dine Rewards. Johnson Dep. 144:9-145:1 ("'I'll be like, 'Hey,' I'm like, 'are you a Dine Reward member?' They'll be like 'no.' I'll say 'well' -- I'll say, 'Would you like to sign up?' I'll say, you know -- I would tell them like with the Dine Rewards, I'll say, 'You can' -- I'll say, 'We have […] promotions where if you're a Dine Reward member, you can come in and get a free blooming onion, you can get a free appetizer of your choice.' I said, 'By being a Dine Reward member you come in so many times you can -- you can get a free appetizer or you can get a certain amount

3

taken off your check.' So, you know, and they was like 'Oh, okay. Cool. Okay.'"); 162:14-16 ("I would tell them can they leave a review about their experience"). In fact, customers mentioned Johnson informing them about Dine Rewards in their Google reviews. Johnson Dep. 145:2-14. Johnson was told that this Outback location "was pretty much last in the region," but note that his Dine Reward and Google reviews were up for months. Johnson Dep. 138:22-23; 136:7-9. This led to Johnson's Outback location moving up to second or third or fourth place in the region, within Johnson's first month of working there. Johnson Dep. 142:18-24; 145:15-146:14. On Black Friday weekend, Johnson's Outback location came in first place in a competition among all the stores. Johnson Dep. 144:1-8. During his tenure, Johnson was told via GroupMe and text, including by managers – in relation to increased Dine Rewards and Google reviews – "Good job, Rodney. Keep up the good work. You're doing awesome. You're doing great." Johnson Dep. 143:13-25; 147:12-23. Outback maintained a board in the back for print-outs of Google reviews; this board was filled predominantly with Google reviews of Johnson's services, further demonstrating that any shortcomings of Outback may not be attributed to Johnson. Johnson Dep. 142:1-15. Other shortcomings of Dine Rewards or Google reviews could be attributed to Outback being short-staffed. Johnson Dep. 250:2-4. Moreover, Johnson wasn't the only Outback team member responsible for boosting these numbers; it was on the servers as well to offer the Dine Rewards and Google reviews. Johnson Dep. 138:24-139:9. Note further that the duty of employees to promote Dine Rewards and Google reviews remained elusive; in other words, Johnson was not informed of any specific metric by which he was expected to boost these numbers. Johnson Dep. 139:10-140:2; 143:3-8. Barney never criticized Johnson's work; only mentioned Dine Rewards and Google reviews as a response to Johnson's complaints, telling

4

Johnson he was "worrying about the wrong things." Johnson Dep. 157:9-18; 158:5-9 ("Q Was there ever a conversation or notice, otherwise, provided to you that you were not satisfying or fulfilling your job duty of actively promoting the Dine Rewards program? A No."); 249:12-250:1 ("[…] Q […] that was in response to you making also a complaint, and he's saying, 'Well, you need to focus on your job,' right? A No. Yeah. He told me that I need to focus on Dine Rewards and Google reviews"). If there is any doubt as to Johnson's performance regarding Dine Rewards and Google reviews, it can be attributed to Outback always being short-staffed, and Johnson needing to compensate accordingly by focusing on helping guests get their food. Johnson Dep. 153:1-154:4 ("I was told don't worry about they waiting forty (40) minutes or fifty (50) minutes on their food, to try to focus on Dine Rewards and Google reviews. I say […] 'Hey, ain't nobody going to want to sign up for no -- for no Dine Rewards or give -- or give a good review if they been here for forty (40) minutes or an hour waiting on their food, […]' […] I got to bring food, I got to make drinks, I got to work expo, I got to hop on the line because we shorthanded. You know, it's impossible."); 155:11-157:8 (any decline in Dine Rewards or Google reviews can be attributed to Outback being short-staffed; during such times, Johnson was focused on compensated for missing staff members); 158:13-24. It is also untrue that Johnson was not a team player; in fact, Johnson received a raise, from Barney, due to his habit of coming into work at Outback even on his off days and on weekends, and on days when they were short-staffed. Johnson Dep. 135:20-136:19. Johnson was so dedicated to Outback that he even offered to help at another Outback location, in the event that they were short-staffed. Johnson Dep. 200:7-15. Notably, neither Barney nor Joslyn Silva talked to Johnson about failing to actively promote Outback's Dine Rewards program, or about not being a team player or not assisting employees during peak

5

times. **Johnson Dep. 160:10-23** ("because they can tell you I was all over the place. I was on the line. I was in To-Go. I was expoing. I was everywhere.  I worked the line better than the workers that's been there for ten (10), twelve (12) years.  I ran circles around them").

6.      For example, Johnson was observed using his personal computer for non-work-related tasks while guests required attention.(Exhibit 2, Barney Declaration.)

**Response: Denied. Johnson did not ever use a personal device to do non-work-related tasks while at work. Johnson Dep. 160:24-161:11. There was never any conversation between Silva or Barney and Johnson about not doing non-work-related tasks on a device, because there was never any need for such a conversation. Johnson Dep. 161:12-17.**

7.      In response and on multiple occasions, Barney verbally counseled Johnson regarding his lack of productivity and teamwork. (Exhibit 1, Johnson Deposition 137:10-139:7, 147:24-148:10, 152:23-157:18, 158:5-24; Exhibit 2, Barney Declaration.)

**Response: Denied. Barney never met with Johnson or counseled him about any lack of productivity. Johnson Dep. 161:18-20. Barney never counseled Johnson about his lack of teamwork, because there was no need to ("when I tell you I was everywhere in there working, where don't even have to ask me to, I was everywhere. I was getting in there and sweating"). Johnson Dep. 161:21-25; 298:3-7 (between the time of Johnson's report to corporate on April 1st to the time of termination on May 1, 2024, Brent did not advise Johnson of any fault in his work performance). Barney has demonstrated a pattern of manufacturing fault with Plaintiff's work; such alleged faults are untrue. Johnson Dep. 296:22-298:2; 298:12-21.**

8.      In April 2024, Outback's Regional Manager, Dale Rockett ("Rockett"), met and spoke with Johnson for about an hour regarding Barney's expectations being too high. (Exhibit 3, Employee Relations Case: US-2024-9909, *see* section titled "Case Notes".)

**Response: Denied. Johnson never spoke with Rockett. Johnson Dep. 165:7-166:23 ("[…] 'I want to talk to Dale.' […] from April 1st when I […] called and reported it [to corporate]. So I was just sitting there waiting, you know, all March, well, April, and to hear from them, but I never heard").**

9.    Rockett clarified that it was Barney's responsibility to set expectations and hold employees accountable for unsatisfactory performance. (Exhibit 3, Employee Relations Case: US2024-9909, *see* section titled "Case Notes".)

**Response: Qualified. Plaintiff lacks sufficient personal knowledge to admit or deny. Johnson Decl. ¶ 36 ("Because I never met or spoke with Rockett during April 2024, I have no personal knowledge of any separate conversation that Rockett may have had with Barney about Barney's expectations or about holding employees accountable for allegedly unsatisfactory performance").**

10.    At no point did Johnson raise concerns to Rockett or Barney about theft at the restaurant. (Exhibit 2, Barney Declaration; Exhibit 3, Employee Relations Case: US-2024-9909, *see* section titled "Case Notes")

**Response: Denied. Johnson raised concerns to Barney about theft on multiple occasions. Johnson Dep. 165:16-166:23 (Johnson called Barney on April 1, 2024, and said, among other things, "They sitting up here using your card to get money […] so they don't have to work. […] they're making all this free money, and they are not working;" during this same conversation, Johnson told Barney that he had audio recordings of Barney and Silva talking about how they would let people comp food and other items); 247:25-248:16. Johnson also attempted to raise concerns with Rockett, but was unable to because Silva did not send Johnson Rockett's phone number. Johnson Dep. 164:22-165:13; 187:1-10; 204:4-11; 205:10-**

**22. On May 2, 2024, Johnson also asked another key, Dre, about how to get in touch with Rockett; this was also to no avail. Johnson Dep. 198:20-199:6; 199:13-19; P11. Johnson also texted Jason, the general manager at the Outback on Jones Creek Road, in the hopes that Jason would have information on how to contact Rockett. Johnson Dep. 199:20-200:6. Notably, Johnson was terminated shortly after telling Barney that he wanted to speak with Rockett. Johnson Dep. 204:12-205:3 ("[…] I said, 'I want to talk to Dale,' that's when he said, 'We got to let you go. We got to make cuts'"); 208:17-210:22 (During this same conversation, Johnson informed Barney that he already called on April 1, 2024 "'and reported everything';" immediately after, Barney said "'I got to make cuts, so you're fired. I got to let you go'").On May 2, 2024, Johnson texted Rockett because he wanted to discuss the circumstances of his termination and why they fired him. Johnson Dep. 202:21-203:9. Specifically, Johnson wanted to let Rockett know that he had called on April 1, 2024 and reported everything prior to his termination, and that he believes he was terminated partially because Johnson had asked for Rockett's contact information. Johnson Dep. 203:9-21.**

11.    On May 1, 2024, Barney received a report that Johnson instructed guests to leave him a positive Google review and to claim that the server "sucked." (Exhibit 2, Barney Declaration.)

**Response: Denied. Johnson Dep. 162:9-19 ("Q I thought that's what you said you would do is that you would be -- A No, no. I would ask them -- I was told for us to ask them to leave a positive review. I ain't never said a positive review about me. […] I would tell them can they leave a review about their experience […] at Outback, not, oh, just leave one about me. No, I never"); 162:20-164:21 ("Q What about have you ever instructed a customer to leave a review that a server sucked? A No.;" Johnson got a text that said "Renee said that you had**

got a customer to write a bad review about her.;" Johnson said, "'No way.' I said, 'I been […] in To-Go all morning,' you know, because we ain't had nobody in To-Go'"); 184:1-185:7 ("[…] she asked me if -- if I asked a customer to do a bad review on Renee. I say, 'No, I did not.' […] I told her that no, I didn't get nobody […] to write no review on her bad.' […]"); 185:11-12 ("she asked me if I did. I told her no"). This false allegation about Johnson instructing a customer to give Renee a negative review occurred on May 1, 2024, the same day as his termination. Johnson Dep. 178:22-179:10.  In fact, on this same day, a false negative review about Johnson had been posted – after Johnson refused to allow Renee to use his comp card – stating that Johnson had been disrespectful to a customer who had kids with her; "I wind up texting [Joslyn], and I told her that, 'I don't know what kind of bullcrap y'all trying to […] pull […] with that Google review y'all just made up.' […] I said, 'But I haven't talked to nobody in the front of the house with no kids today. […] I've been in To-Go […] all day today. […] I only went out there once […] and I didn't talk to nobody who had kids, and I went out there briefly.'" Johnson Dep. 166:24-167:10 ("[…] y'all made it up because -- she got mad because I told her she wasn't getting my comp card. She wasn't getting my card to comp nothing off. Y'all use Brent card. […] you not getting my card to comp nothing off of. And I guess the tone I told it to her she didn't like, and that's when all that started"); Johnson Dep. 169:9-17; 170:8-13; 170:14-171:1 ("that was the very first negative review that I ever got, and I already knew it was made up. Q So you've said that a few times, that you know it was made up. A It was"); 171:2-173:1 (Johnson knows this review was fake because he worked To-Go that morning and did not work in the front at all, except for a brief few minutes when a male customer asked him how long his food was going to be, and Johnson promptly rectified the issue); 173:2-174:6 ("Johnson does not know who made the

9

review, just that it was false, given that Johnson only spoke to a male customer that day, not a lady with her kids"); 174:7-175:7; 175:13-176:2 (Johnson thinks it was suspicious timing that on the same day when Renee asked to use his card, the false negative review was posted, and that around the same time, there was a claim that he asked a guest to make a false review about Renee). This false negative review occurred on May 1, 2024, the same day as Johnson's termination. Johnson Dep. 178:22-179:10.

12. Based upon that inappropriate behavior, coupled with ongoing issues with Johnson's performance, Barney immediately terminated Johnson's employment. (Exhibit 2, Barney Declaration.)

Response: Qualified. Plaintiff admits that his employment was terminated by Barney, but denies that this was due to inappropriate behavior and performance issues; rather, this was plainly retaliatory, as is evidenced by the short timing between Johnson's most recent complaint about theft and his termination. Johnson Dep. 167:11-20 ("But when I called Brent and told Brent about it, he told me […] 'Well, we got to let you go.' I say, 'Why?' 'Oh, because we have -- we have -- we had got word from corporate that we got to make cuts.' I'm like -- I'm like so all of a sudden y'all got to make cuts. That's what I was told. He was like, 'Yeah. We got to make cuts, so I got to let you go'"). Barney terminated Johnson shortly after learning that Johnson wanted to talk to Rockett, that Johnson called corporate to report theft, and that Johnson had recordings of Barney and Silva discussing theft. Johnson Dep. 167:21-169:3; 204:12-205:5; 242:21-243:4; 247:25-248:16; 252:6-21 ("In my belief my termination was wrong because I asked to speak to the district manager, the regional manager, and to inform him about everything that was going on in the restaurant. And prior to that, like I say, I wind up [...] calling HR and everything to report it. And by me telling

him directly out of my mouth I want to -- I want to speak to Dale, and they'll know everything that's going on with theft and everything, that's how I feel I was terminated"); 257:4-258:1 ("Q […] What is the violation of law that you believe that Outback committed? A Terminating me because of me asking to talk to a regional manager" to report theft); 258:2-8 ("Q […] The law that […] you believe Outback violated was terminating you because you asked for Dale's contact information? […] A Yeah"); 260:12-15 ("you believe you were terminated in part for advising the company that your coworkers were stealing from the company. A Yeah, yes. Amongst other things, yes"). Johnson believes Barney's explanation, that they needed to make cuts, is false because there was no prior talk of cuts, because the comment was made in response to Johnson asking Barney for Rockett's contact information, and because Johnson had already been approved for vacation starting the next Monday. Johnson Dep. 243:15-244:4; 244:16-245:4; 245:5-14; 245:15-246:12.  Johnson's termination did not make sense, given the combination of his exceptional performance, and the Outback location's issue with being short-staffed. Johnson Dep. 169:3-8 ("y'all don't have people there as it is, […] they been shorthanded for – for at least three months. […] they couldn't keep nobody in there"); 210:23-211:10 (Johnson immediately responded to Barney's termination of him by responding that the store was understaffed, not overstaffed, suggesting that making cuts is nonsensical); 211:11-16 ("[…] we don't have servers as it is. We always short on servers. We always short on […] To-Go workers. We short on food runners. Yes. And we short on line cooks"); 211:17-24 ("[…] they […] hire people on a daily basis trying to get them to come and work. […] they was always looking to get people in"); 211:25-212:13 ("[…] I just basically told him that how you got to make cuts when we already understaffed. We don't have people in here as it is"); 239:16-21 ("Johnson does not believe that Barney's

11

rationale for terminating him was that they had to make cuts"); **239:22-240:17** ("Q [...] consider that Brent is right, that the company did have to make cuts; could that be possible? A No. [...] they was understaffed at Outback. [...] they was hiring people every day [...] Q. You're talking about staffing levels. But in operating a business there could be other ways they need to make cuts; would you consider that to be true? A No"); **240:22-241:6** ("[...] There was no talk or discussion about they have to make cuts ever, you know. [...] I'm part of management. If they say they have to make cuts, I would -- you know, they talked to us about stuff dealing with the restaurant"); **241:7-242:8** ("[...] Q [...] Are you in meetings where Brent is with other managers -- A Yes. Q [...] Well, are they talking about making cuts? A No. Q [...] Not in the ones that you're in at least? A Not the ones I'm in. [...] every meeting that they had it would be the managers and the keys").   For example, even during their phone conversation about Johnson receiving a negative review, Silva did not mention anything to Johnson about his performance or termination. **Johnson Dep. 186:2-11; 187:23-188:1.** Prior to May 1, 2024, there were no discussions between Johnson and Barney, Silva, and/or Rockett about Johnson's potential termination. **Johnson Dep. 188:2-8.** Prior to May 1, 2024, Johnson was not expecting to be terminated; in fact, he "was going on vacation." **Johnson Dep. 188:9-11.** Moreover, other servers like Renee and Danielle had greater performance issues than Johnson, as demonstrated by guests complaining about Renee and Danielle's service. **Johnson Dep. 176:17-177:9.**

13.    On May 2, 2024, the day following his termination, Johnson filed a complaint with Outback's Employee Relations department ("ER Department"). (Exhibit 3, Employee Relations Case: US-2024-9909.)

12

**Response: Qualified.  Johnson filed *another* complaint; otherwise admitted.  <u>Johnson Decl.</u> <u>¶¶ 43-45</u> ("On May 2, 2024, the day after my termination, I contacted Outback's Employee Relations Department and made another complaint concerning the comp-card conduct, the reports I had made before my termination, and the circumstances of my termination;" "My May 2, 2024 complaint was not my first complaint;" "Before May 2, I had repeatedly raised the comp-card conduct with Barney and had made the April 1, 2024 report to Outback's corporate complaint line").**

14.    On May 6, 2024, Johnson submitted a second complaint with Outback's ER Department. (Exhibit 1, Johnson Deposition 159:8-17; Exhibit 4, Employee Relations Case: US2024-9937, section titled "Case Details.")

**Response: Qualified, as this was not Johnson's second complaint; otherwise admitted. <u>Johnson Decl. ¶¶ 46-48</u> ("On May 6, 2024, I submitted yet another complaint to Outback's Employee Relations Department;" "My May 6, 2024 complaint was not my second complaint;" "By May 6, I had already complained to Barney on multiple occasions, reported the conduct to Outback's corporate complaint line on April 1, and contacted Employee Relations on May 2").**

15.    Outback has no record of Johnson submitting a complaint any time in April of 2024. (Exhibit 3, Employee Relations Case: US-2024-9909, section titled "Synopsis;" Exhibit 4, Employee Relations Case: US-2024-9937, sections titled "Synopsis" and "Case Notes.")

**Response: Qualified. Plaintiff lacks sufficient personal knowledge to admit or deny. Plaintiff maintains that he did complain to corporate. Johnson called corporate on April 1, 2024. <u>Johnson Dep. 179:11-14; 216:4-9; 223:20-224:18</u> (Johnson first spoke to HR, and then HR gave him the number for the complaint line, which he called). During this approximately**

**twenty (20) to thirty (30) minute phone conversation, Johnson complained that "the manager was letting employees use their comp card to comp [...] food off and pocket the money," among other problems including with cleanliness and cross-contamination. <u>Johnson Dep. 224:19-226:7.</u> At this time, corporate responded that "going to do an investigation into it. It may take a little time. And that they were going to reach back out to [Johnson]." <u>Johnson Dep. 226:13-19.</u> Despite corporate saying they would reach back out to Johnson via his phone or email, Johnson has not ever heard back from them; he did not ever receive an email in connection with his complaint to corporate, nor did he receive a confirmation email that he made a complaint. <u>Johnson Dep. 226:23-227:16; 228:1-12.</u>**

16.     Johnson's pay records show that he worked the same amount – 27.50 hours per week – in April of 2024 as he had for the previous six months, dating back to November of 2023. (Exhibit 5, Johnson's Pay Records.)

**Response: Admitted.**

17.     Rockett met with Johnson in April of 2024 to discuss Johnson's belief that Barney is "always on him" and that if Johnson stops in the kitchen, Barney will redirect him back to the dining room. (Exhibit 3, Employee Relations Case: US-2024-9909, section titled "Case Notes.")

**Response: Qualified. Plaintiff objects to this statement as immaterial and irrelevant.**

18.     In that meeting, Johnson agreed that it was Barney's restaurant, and Rockett advised that Barney's job is to direct people, to which Johnson acknowledged that Barney does the same with other employees. (Exhibit 3, Employee Relations Case: US-2024-9909, section titled "Case Notes.")

**Response: Qualified. Plaintiff objects to this statement as immaterial.**

## ADDITIONAL MATERIAL FACTS

1.      Johnson was employed at Outback's restaurant on South Acadian Thruway in Baton Rouge, Louisiana, as a Front-of-the-House Key from approximately July 31, 2023, until his termination on May 1, 2024. Johnson Decl. ¶ 4.

2.      Barney himself recruited Johnson from Fleming's Steakhouse, a sister company of Outback, to work at Outback, demonstrating Johnson's qualifications to perform the job he was hired to do. Johnson Dep. 125:23-127:25; 132:17-23; 238:1-8.

3.      In fact, Barney offered to pay Johnson a high rate compared to other workers, on account of "how good of a worker" Johnson was at Fleming's. Johnson Dep. 132:24-134:12 ("he was like, 'I have workers who have been here for years and years and don't even make that.' […] he talked to the kitchen manager over there, and […] he pretty much said, 'Oh, he praised you to death. And he told me how good of a worker you is. You're one of the best workers that they have. You come to work on time. You don't call out. You know, you never really called out to work. You are persistent, persistent, like, you know, you do everything'"); 239:11-15 (Barney offered Johnson $19.00 per hour, and told Johnson that he doesn't usually start people out like that); 280:19-281:2 ("[…] That's why I evolve in pay raises and stuff like that. I go above and beyond. Even Fleming's, even Bonefish, they can tell you my work was exceptional. They didn't have no problems out of me").

4.      Barney was Johnson's immediate supervisor. Johnson Dep. 137:8-9.

5.      Barney did not ever criticize Johnson's work. Johnson Dep. 137:10-13.

6.      While at Outback, Johnson earned a raise of $1.00 per hour, which brought his pay rate up to $20.00 per hour. Johnson Dep. 135:1-19. This was approximately one or two months before Johnson was terminated. Id.

15

7.      Johnson earned this raise due to his excellent performance; he would come into work at Outback even on his off days and on weekends, on days when they were short-staffed, and he went up on the Dine Rewards and Google reviews for months. Johnson Dep. 135:20-136:19; 285:11-286:5 ("[…] I take pride in everything I do. I go above and beyond. […]").

8.      Barney himself told Johnson, "You're doing an excellent job, […] and you do deserve this raise." Johnson Dep. 136:13-14.

9.      Johnson maintained a positive attitude toward his work at Outback; "I took Two Dollars ($2.00) less [than expected raise amount] because […] I don't mind having to drop down, and you know, I'm learning something new. This was new to me. It was a new experience. And I came to love it." Johnson Dep. 136:21-25.

10.     In his role at Outback, Johnson would "make [guests] feel like it's home" by "mak[ing] them feel warm and […] welcome," and otherwise checking in on tables to see how long they have been waiting and fix any issues. Johnson Dep. 140:12-141:15.

11.     Johnson would otherwise perform his duties at Outback with exceptional ability. Johnson Dep. 288:16-290:1 ("on my free time that I had, when we were slow, I would go in the back, and I started portioning fries. I started portioning the broccoli. I started portioning out a lot of stuff so it wasn't waste").

12.  Such exceptional ability was reflected in Johnson's Dine Rewards and Google reviews, which were positive, and which Johnson actively promoted. Johnson Dep. 144:9-145:1 ("'I'll be like, 'Hey,' I'm like, 'are you a Dine Reward member?' They'll be like 'no.' I'll say 'well' -- I'll say, 'Would you like to sign up?' I'll say, you know -- I would tell them like with the Dine Rewards, I'll say, 'You can' -- I'll say, 'We have […] promotions where if you're a Dine Reward member, you can come in and get a free blooming onion, you can get a free appetizer of your choice.' I said,

'By being a Dine Reward member you come in so many times you can -- you can get a free appetizer or you can get a certain amount taken off your check.' So, you know, and they was like 'Oh, okay. Cool. Okay.'"); 162:14-16 ("I would tell them can they leave a review about their experience"). In fact, customers mentioned Johnson informing them about Dine Rewards in their Google reviews. Johnson Dep. 145:2-14. Johnson was told that this Outback location "was pretty much last in the region," but note that his Dine Reward and Google reviews were up for months. Johnson Dep. 138:22-23; 136:7-9. This led to Johnson's Outback location moving up to second or third or fourth place in the region, within Johnson's first month of working there. Johnson Dep. 142:18-24; 145:15-146:14. On Black Friday weekend, Johnson's Outback location came in first place in a competition among all the stores. Johnson Dep. 144:1-8. During his tenure, Johnson was told via GroupMe and text, including by managers – in relation to increased Dine Rewards and Google reviews – "Good job, Rodney. Keep up the good work. You're doing awesome. You're doing great." Johnson Dep. 143:13-25; 147:12-23. Outback maintained a board in the back for print-outs of Google reviews; this board was filled predominantly with Google reviews of Johnson's services, further demonstrating that any shortcomings of Outback may not be attributed to Johnson. Johnson Dep. 142:1-15. Other shortcomings of Dine Rewards or Google reviews could be attributed to Outback being short-staffed. Johnson Dep. 250:2-4. Moreover, Johnson wasn't the only Outback team member responsible for boosting these numbers; it was on the servers as well to offer the Dine Rewards and Google reviews. Johnson Dep. 138:24-139:9. Note further that the duty of employees to promote Dine Rewards and Google reviews remained elusive; in other words, Johnson was not informed of any specific metric by which he was expected to boost these numbers. Johnson Dep. 139:10-140:2; 143:3-8. Barney never criticized Johnson's work; only mentioned Dine Rewards and Google reviews as a response to Johnson's complaints, telling Johnson he was

"worrying about the wrong things." Johnson Dep. 157:9-18; 158:5-9 ("Q Was there ever a conversation or notice, otherwise, provided to you that you were not satisfying or fulfilling your job duty of actively promoting the Dine Rewards program? A No."); 249:12-250:1 ("[…] Q […] that was in response to you making also a complaint, and he's saying, 'Well, you need to focus on your job,' right? A No. Yeah. He told me that I need to focus on Dine Rewards and Google reviews").  If there is any doubt as to Johnson's performance regarding Dine Rewards and Google reviews, it can be attributed to Outback always being short-staffed, and Johnson needing to compensate accordingly by focusing on helping guests get their food. Johnson Dep. 153:1-154:4 ("I was told don't worry about they waiting forty (40) minutes or fifty (50) minutes on their food, to try to focus on Dine Rewards and Google reviews. I say […] 'Hey, ain't nobody going to want to sign up for no -- for no Dine Rewards or give -- or give a good review if they been here for forty (40) minutes or an hour waiting on their food, […]' […] I got to bring food, I got to make drinks, I got to work expo, I got to hop on the line because we shorthanded. You know, it's impossible."); 155:11-157:8 (any decline in Dine Rewards or Google reviews can be attributed to Outback being short-staffed; during such times, Johnson was focused on compensated for missing staff members); 158:13-24.  It is also untrue that Johnson was not a team player; in fact, Johnson received a raise, from Barney, due to his habit of coming into work at Outback even on his off days and on weekends, and on days when they were short-staffed. Johnson Dep. 135:20-136:19. Johnson was so dedicated to Outback that he even offered to help at another Outback location, in the event that they were short-staffed. Johnson Dep. 200:7-15.  Notably, neither Barney nor Joslyn Silva talked to Johnson about failing to actively promote Outback's Dine Rewards program, or about not being a team player or not assisting employees during peak times. Johnson Dep. 160:10-23 ("because they can tell you I was all over the place. I was on the line. I was in To-Go. I was expoing. I was

everywhere.  I worked the line better than the workers that's been there for ten (10), twelve (12) years.  I ran circles around them").

13.    While employed at Outback, Johnson witnessed servers, including Danielle and Renee, using managers' comp cards to comp off items and pocket said money, numerous times. Johnson Dep. 272:9-21; 193:19-194:5 (Danielle and Renee had Barney's comp card "pretty much all day, especially when he's not there. And they can just go into what-you-call-it and just deduct off, like, just pocket money using his card"); 194:13-14 ("especially on the days where he was off on Wednesdays, they had his card"); 261:9-22 (in addition to comp cards, the theft also involved using Tuck Away cards, which are "kind of like gift cards" typically given "when people have a bad experience"); 281:3-11 ("Q The employment act or practice you're focusing on here is Brent's use or permission to use his comp card to give money to Danielle, Renee, and other servers; is that right? A Yes, but mainly Danielle and Renee;" and using the comp card for that purpose was not allowed) (illegal use of comp cards and Tuck Away cards referred to as the "Scheme")

14.    Johnson knew that such comping was not for legitimate reason because he had heard Danielle and Renee say that, at a table that only tipped them ten dollars ($10.00), "they had to comp Twenty Dollars ($20.00) worth of food just to […] make a good tip off that table." Johnson Dep. 272:22-273:8.

15.    Similarly, Johnson was aware that Outback did not approve of comp taking due to a meeting Barney had given explaining that corporate had emailed complaining that comps are high; and due to a meeting which included warnings from corporate to not overuse comp cards and Tuck Away cards. Johnson Dep. 274:2-23; 283:19-284:14.

16.    Nonetheless, Barney and Silva encouraged servers to partake in the Scheme. Johnson Dep. 261:23-262:2 (Brent would allow Danielle and Renee to use his comp card); 262:3-

19

10 (Barney and Joslyn would give servers other than Renee and Danielle the comp card as well, but mostly gave them Tuck Away cards); 269:25-270:3 ("[…] Brent gave them the comp card so they can leave with good tips at the end of the day"); 270:5-11 (Brent and Joslyn would do the same thing for other servers, just not to the same degree or amount).

17.    Barney and Silva promoted the Scheme because they wanted to make sure everyone made money/was taken care of/"everybody eats." Johnson Dep. 33:8-24; 39:1-40:20; 42:16-44:23 ("[…] '[…] we do that for everybody. We make sure everybody eat. You know, if they get a bad table and nobody done tip, we go in there, and we comp something off and […] we give it to them […] in tips. You know what I'm saying, we knock something off and then, you know, give […] a little something'; "Brent and Joslyn both said that they do. They said they make sure everybody eats because they know it's hard for servers to make money. [...] that's how they stated it, they make sure everybody eats, like make sure everybody makes some money on their shifts"); 193:9-18; 273:22-274:1.

18.    Johnson complained about the theft to Barney numerous times, each to no avail. Johnson Dep. 165:16-166:23 (Johnson called Barney on April 1, 2024, and said, among other things, "They sitting up here using your card to get money […] so they don't have to work. […] they're making all this free money, and they are not working;" during this same conversation, Johnson told Barney that he had audio recordings of Barney and Silva talking about how they would let people comp food and other items); 247:25-248:16; 273:8-21 ("I also had […] verbally talked to Brent and told Brent that I heard [Danielle and Renee]. They was talking about how they left last night with Seven Hundred Dollars ($700.00) worth of tips, and they had to do a lot of comping. […] Q And what did he say? A I'm worrying about the wrong thing. Q He didn't say,

"Oh, I'll look into that"? A No. Q He didn't say, "Oh, that's wrong"? A No. He doesn't -- never say nothing"); 295:16-17.

19.    Barney and Silva protected servers from being caught partaking in the Scheme; evidencing knowledge that the Scheme was illegal. Johnson Dep. 191:11-25 ("[…] "Brent and Joslyn was going around telling [the servers] that watch what they say around me, I'm the police. And also [...] Robert [...] told them to be careful, make sure that I don't see them using the card"); 192:11-17 ("Robert heard [...] Brent telling Danielle and Renee to […] watch out for me before they use [the comp card]").

20.    Servers themselves hid their possession of Barney's comp card from Johnson, further evidencing that the Scheme was illegal. Johnson Dep. 194:15-24.

21.    Johnson refused to partake in the Scheme; for example, when Renee asked Johnson to use his comp card (so as to avoid the questionable appearance of there being too many comps on Barney's comp card), Johnson refused. Johnson Dep. 194:25-196:14.

22.    Johnson was not the only employee to refuse to partake in the scheme, due to its wrongful nature; Maddy also refused, and Robert complained about Renee and Danielle's conduct as well. Johnson Dep. 188:12-190:8 (Robert "was mad, upset, that they was using the card also," and that "[t]hey were trying to be sneaky"); 196:15-197:9 (Maddy did not want excess comps under her name via her card); 306:22-307:13 (Maddy told Johnson not to give them his card "because they were stealing"); Johnson Decl. ¶¶ 18-22, Ex. A (P9).

23.    Maddy "wound up having to get a transfer" after similarly complaining that Barney was "allowing people to comp food and steal." Johnson Dep. 274:24-275:5; 307:19-20.

24.    In March 2024, Johnson had verbally reported to Barney that Silva had relationship(s) with the employees. Johnson Dep. 231:6-233:9; 234:12-15.

21

25.    On March 28 or 29, 2024, Johnson texted Barney to ask for the corporate number so that Johnson can call them. Johnson Dep. 229:5-24.

26.    After Johnson did not receive any response from management within the restaurant, he reported the theft up to corporate. Johnson Dep. 304:22-306:2.

27.    Johnson called corporate on April 1, 2024. Johnson Dep. 179:11-14; 216:4-9; 223:20-224:18 (Johnson first spoke to HR, and then HR gave him the number for the complaint line, which he called).

28.    During this approximately twenty (20) to thirty (30) minute phone conversation, Johnson complained that "the manager was letting employees use their comp card to comp [...] food off and pocket the money," among other problems including with cleanliness and cross-contamination. Johnson Dep. 224:19-226:7.

29.    At this time, corporate responded that "going to do an investigation into it. It may take a little time. And that they were going to reach back out to [Johnson]." Johnson Dep. 226:13-19.

30.    Despite corporate saying they would reach back out to Johnson via his phone or email, Johnson has not ever heard back from them; he did not ever receive an email in connection with his complaint to corporate, nor did he receive a confirmation email that he made a complaint. Johnson Dep. 226:23-227:16; 228:1-12.

31.    Johnson was terminated on May 1, 2024. Johnson Dep. 177:18.

32.    Notably, Johnson was terminated shortly after telling Barney that he wanted to speak with Rockett. Johnson Dep. 204:12-205:3 ("[…] I said, 'I want to talk to Dale,' that's when he said, 'We got to let you go. We got to make cuts'").

33.    Johnson believes that his "termination was based on me making multiple reports to them about everything that was going on, about all […] the things that I was seeing." Johnson Dep. 233:15-234:11; 234:16-25; 285:3-7 ("Do you believe you would have been terminated had you not made the report to corporate on April 1, 2024? A No. […] I don't believe so"); 288:3-15 (Johnson believes he was terminated because he made a complaint to Barney about the comp card theft, and because, also on May 1, 2024, he let Barney know that he was going to report this to Dale); 304:9-14 ("Q […] When you made reports to management within Outback where you worked, did you tell them you believed that there was theft going on? A Yes").

34.    For example, on another occasion, Johnson had reported other employees' drug usage to Barney. Johnson Dep. 235:7-237:8.

35.    The retaliatory nature of Johnson's termination is further evidenced by his text message(s) to Barney shortly after. Johnson Dep. 214:9-215:5 ("[…] I didn't want him to think that they were going to just get away with just firing me because I wanted to talk to Dale […]"); P6.

36.    This was part of a pattern of Barney dismissing issues that Johnson raised to him about how the restaurant was being run; for example, Barney similarly dismissed Johnson's concerns about cross-contamination, inedible food, kids washing dishes and "busting tables," employees smoking weed, popping pills, and drinking while on the job, and employees urinating on the line due to popping pills. Johnson Dep. 149:6-151:1.

37.    Again, Barney dismissed these concerns by Johnson, instead getting mad and telling Johnson "that I'm worrying about the wrong things, that my job is Dine Rewards and Google reviews, and […] don't worry about nothing else but that. Don't worry about how, you know, he's running his kitchen and what he's doing." Johnson Dep. 148:13-149:5.

38.     This was in spite of the fact that Johnson himself was also a manager, and being conscientious of such issues and liabilities within the restaurant was part of his job duties. Johnson Dep. 148:24-149:5 ("I guess he got aggravated because I was always coming telling him […] about things like, 'Y'all telling me that I'm part of management, so if I see something wrong, it's my -- it's my responsibility to come and let you know what I see that's going on is wrong.'"); 150:23-151:1; 151:25-152:22 (Johnson ran the restaurant when other managers were not there; Johnson conducted interviews); Johnson Decl. ¶¶ 6 ("When the other managers were unavailable, I was responsible for running the restaurant"); 8 ("Because I was part of management, I understood that it was my responsibility to notify the other managers when I observed conduct that was unsafe, unlawful, dishonest, or otherwise contrary to the proper operation of the restaurant").

39.     Notably, between the time of Johnson's report to corporate on April 1st to the time of termination on May 1, 2024, Barney did not advise Johnson of any fault in his work performance. Johnson Dep. 298:3-7.

40.     Earlier in the day on May 1, 2024, a false negative review was posted about Johnson, and Johnson was falsely accused of asking a customer to give another server, Renee, a negative review. Johnson Dep. 178:22-179:10.

41.     On May 1, 2024, despite discussing the alleged negative review about Johnson, Silva did not discuss with Johnson anything about his performance or termination. Johnson Dep. 186:2-11; 187:23-188:1.

42.     Prior to May 1, 2024, there were no discussions between Johnson and Barney, Silva, and/or Rockett about Johnson's potential termination. Johnson Dep. 188:2-8.

43.     Following Barney's termination of Johnson, Barney refused to give Johnson a pink slip so that he could get unemployment. Johnson Dep. 221:11-222:7.

44.    On the day after Johnson's termination, May 2, 2024, Renee and Danielle had been in Barney's office all day. Johnson Dep. 197:17-25; P10.

45.    Johnson continued calling corporate to complain, multiple times after his termination on May 1st; each time, to no avail. Johnson Dep. 295:19-22; Johnson Decl. ¶¶ 49-50.

46.    Since his termination, Johnson has experienced stress and depression, which culminated in congestive heart failure and a stroke, hospitalization, and multiple medications. Johnson Dep. 14:24-17:8; 300:3-12; 300:16-302:15.

Dated: Jamaica, New York
      August 7, 2026                           Respectfully submitted,

                                       David S. Moyer, Esq.
                                     **LAW OFFICES OF DAVID S. MOYER**
                                     13551 River Road
                                     Luling, LA 70070
                                     (985) 308-1509
                                     (985) 308-1521
                                     davidmoyerlaw@gmail.com

                                     */s/ Emanuel Kataev, Esq.*
                                     Emanuel Kataev, Esq.
                                     *Admitted pro hac vice*
                                     **CONSUMER ATTORNEYS PLLC**
                                     6829 Main Street
                                     Flushing, NY 11367-1305
                                     (718) 412-2421 (office)
                                     (718) 489-4155 (facsimile)
                                     ekataev@consumerattorneys.com

                                     *Attorneys for Plaintiff*
                                     *Rodney Johnson*